IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WESLEY GRAHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 2:06cv129 |
| ) | **Electronic Filing** |
| THE GUARDIAN LIFE INSURANCE ) | |
| COMPANY OF AMERICA, A MUTUAL ) | |
| LIFE INSURANCE COMPANY and ) | |
| GUARDIAN GROUP SHORT TERM ) | |
| DISABILITY INSURANCE PLAN, and ) | |
| GUARDIAN GROUP LONG-TERM ) | |
| DISABILITY INSURANCE PLAN, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION

September 18, 2007

I.   INTRODUCTION

Plaintiff, Wesley Graham ("Graham" or "Plaintiff"), filed this action against Defendants, the Guardian Life Insurance Company of America, Guardian Group Short Term Disability Insurance Plan, and Guardian Group Long Term Disability Insurance Plan (collectively "Guardian" or "Defendants"), to recover short and long term disability income insurance benefits under Guardian Group Plan No. 352756 (the "Plan"), an employer welfare benefit plan under the Employee Retirement Security Act ("ERISA"), issued by Graham's employer, JADCO Manufacturing, Inc. ("JADCO"). The parties have filed motions for summary judgment, all responses have been filed and the motions are now before the Court.

II.   STATEMENT OF THE CASE

Graham began his employment with JADCO as an estimator on April 16, 1996. On October 1, 2000, Guardian issued an employee benefit plan to JADCO which provided, *inter alia*, short term and long term disability benefits to eligible JADCO employees. The Plan is an employee benefit plan within the meaning of ERISA. As a result of his employment with

JADCO, Graham became participant of the Plan on October 1, 2000.  The Plan provides disability benefits for an employee who becomes "totally disabled," as defined in the Plan, while employed with JADCO.

Prior to his employment with JADCO, Graham was involved in an automobile accident in 1988 and sustained a severe injury to his left arm. Consequently, Graham developed brachial plexopathy which rendered his arm nonfunctional and caused him to suffer chronic pain. Graham alleges that because of the pain, he was unable to go to work on July 21, 2004. Graham contends he contacted his treating physician, David M. Goldstein, M.D. ("Dr. Goldstein") on or about July 28, 2004, because of the pain and was referred to the UPMC Health System Pain Evaluation and Treatment Institute.  According to Dr. Goldstein, Graham was unable to work on July 21, 2004, because of the pain which caused him to remain "fully disabled" and "unable to return to work at [that] time and in the indefinite future."  Graham further contends that because of the disability, JADCO placed him on a leave of absence beginning on July 22, 2004.

Guardian alleges that JADCO placed Graham on an involuntary leave of absence on July 20, 2004, due to poor performance, absenteeism, and tardiness.  Guardian contends that Graham's performance and attendance problems were long standing.  Graham met with his supervisor on June 23, 2004, and July 15, 2004, and was told that he would be placed on an unpaid leave of absence the next time he failed to show up for work.  For the eighteen (18) months prior to July 20, 2004, Graham was late for work or was absent without excuse on twenty-eight (28) occasions.  Therefore, when Graham failed to appear for work on July 21, 2004, he was immediately placed on an unpaid leave of absence.

Under the Plan, an employee's short and long term disability coverage ends "on . . . the date an employee's active full-time service ends for any reason, including . . . leave of absence . . . ." An employee's insurance under the Plan may be continued after his active service ends only if his "active service ends because he . . . is disabled."  Guardian contends that Graham ceased to be a Plan participant and his coverage thereunder terminated when his "active full-time service"

at JADCO ended on July 20, 2004.

On or about October 8, 2004, Guardian received Graham's application for short term disability ("STD") benefits under the Plan based upon severe left upper extremity pain and left brachial plexopathy. By letter dated October 19, 2004, Guardian denied Graham's claim stating:

> After a careful review of your claim, we have determined that we are unable to approve your disability claim. Your last date worked was July 20, 2004, and you were then placed on an unpaid leave of absence effective July 21, 2004. Your physician disabled you as of July 22, 2004 after your leave of absence began. Therefore, since you were on a leave of absence as of the date your disability began, you are not considered an active full time employee and no benefits are payable.

A copy of this letter was also mailed to JADCO. After receiving the letter, a JADCO general manager responded by letter dated November 1, 2004, and stated:

> After receiving your letter dated October 19, 2004 regarding plan # 352756 I noticed an error I made in filling out the Employer Section of the Group Short Term Disability Claim form. Wesley Graham's last day worked was July 20, 2004. He was placed on leave of absence on July 22nd, 2004.

Because of this error, Graham filed an appeal of the denial of his claim. Graham's appeal was denied by Guardian by letter dated January 24, 2005, which stated in pertinent part:

> While Dr. Goldstein has indicated by July 21, 2004, Mr. Graham's "pain level had increased to the point where he could not function at work" and "he has been disabled since at least that date", there is no medical documentation to support total disability since Mr. Graham had not been seen for treatment since February 11, 2004.

Graham again appealed Guardian's decision, and also initiated a claim for long term disability ("LTD") benefits. Guardian declined to reconsider Graham's STD claim, but forwarded his request for LTD benefits to the proper department. Guardian denied Graham's long term disability claim on May 17, 2005, contending that the medical documentation submitted did not support treatment for a condition that limited or restricted his ability to perform the major duties of his regular occupation.

This action was filed by Graham to recover short and long term disability income insurance benefits under the Plan.

**III.     LEGAL STANDARD FOR SUMMARY JUDGMENT**

Pursuant to FED. R. CIV. P 56(c), summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, i.e., one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

**IV.  DISCUSSION**

   A.   Standard of Review of Denial of Benefits

In reviewing a denial of benefits under an ERISA benefit plan, an administrator's decision to deny benefits is reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 253 (3d Cir. 2004). If a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 111-112, 115; *see Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir. 1997). Discretionary authority can be provided for by expressed or implied language in the benefit plan. *Luby v. Teamsters Health, Welfare, & Pension Trust*, 944 F.2d 1176, 1180 (3d Cir. 1991).

Graham argues that the Plan does not provide discretionary authority to the administrator, therefore, a *de novo* review is required. Alternatively, Graham contends that if discretionary authority is implied in the Plan, Guardian failed to exercise discretion in the course of denying benefits, thus requiring a *de novo* review. *See Gritzer v. CBS, Inc.*, 275 F.3d 291, 295 (3d Cir. 2002). The Court disagrees. Guardian's discretionary authority to determine an employee's eligibility for benefits under the Plan and to construe the Plan terms is express. Specifically, the Plan states "Guardian is the Claims Fiduciary with discretionary authority to determine eligibility to determine eligibility for benefits and to construe the terms of the plan with respect to claims." Under the Plan, Guardian has the right to determine if an employee has met "all of the . . . conditions" necessary to receive disability benefits. Moreover, Guardian clearly set forth its

reasons for denial of Graham's benefits[1]. Therefore, Guardian's denial of benefits in this case shall be reviewed under the deferential arbitrary and capricious standard as opposed to a *de novo* review.

Under the arbitrary and capricious standard of review, a court should not overturn an administrator's eligibility decision unless it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (3d Cir. 2000); *Abnathya v. Hoffmann-La Roche Inc.*, 2 F.3d 40, 45 (3d Cir. 1993). A decision is supported by "substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Daniels v. Anchor Hocking Corp.*, 758 F. Supp. 326, 331 (W.D. Pa. 1991). Moreover, under this narrow scope of review a court is not free to substitute its own judgment for that of the administrator in determining eligibility for plan benefits. *Abnathya v. Hoffmann-LaRoche, Inc.*, 2 F.3d at 45

In the Third Circuit, however, it is recognized that "when an insurance company both funds and administers [ERISA plan] benefits, it is generally acting under a conflict [of interest] that warrants a heightened form of the arbitrary and capricious standard of review." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d at 378. To determine the specific heightened standard, the Third Circuit has adopted a "sliding scale" approach, which requires a district court to "consider the nature and degree of apparent conflicts with a view to shaping . . . review of the benefits determinations of discretionary decisionmakers." *Id.* at 393. This approach allows the court to "take notice of discrete factors suggesting that a conflict may have influenced the administrator's decision." *Id.* Courts should consider not only the reasonableness of the result, but also the process by which the result was achieved. *Id.* at 393. "Suspicious events" and "procedural anomalies" raise the likelihood of self-dealing and move the review toward the

---

[1] Initially, Guardian denied Graham STD benefits on October 19, 2004, because it was misinformed regarding the date of Graham's leave of absence. Thereafter, Guardian specifically indicated that Graham's request for both STD and LTD benefits were denied because medical evidence did not support his claims.

stricter extreme of the arbitrary and capricious range. *Id.* at 394.  Heightened scrutiny is warranted when there is "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." *Kosiba v. Merck & Co.*, 384 F.3d 58, 66 (3d Cir. 2004).  On the other hand, when there is little evidence of conflict on the part of the administrator, the standard becomes more deferential.  *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d at 393.

Guardian agrees that because it funds the Plan and has discretionary authority to make eligibility determinations and to interpret the terms of the Plan, a heightened arbitrary and capricious standard applies.  However, it argues that there is no evidence in this action that would raise the likelihood of self-dealing that would require the Court to give little or no deference to the administrator's decision. The Court finds no evidence of procedural irregularity, bias, or unfairness in the review of Graham's claim. Therefore, the Court shall apply a standard of review at the "mild end"[2] of heightened arbitrary and capricious standard, and give fair deference to Guardian's decisions.

B.  Coverage Under the Plan

Guardian initially contends that Graham's coverage under the Plan terminated on July 20, 2004, his last full day of employment, and was therefore not an active employee at the time of his disability.  The Plan provides disability benefits if Graham became "totally disabled" as defined in the Plan prior to the date on which his active full-time service at JADCO ended. Guardian alleges that JADCO placed Graham on an involuntary leave of absence on July 20, 2004, due to poor performance, absenteeism, and tardiness. The evidence however indicates that, by letter dated July 22, 2004, JADCO placed Graham on leave due to his performance and attendance

---

[2] When there is no evidence of conflict other than the inherent structural conflict, of both funding and administering the plan, the correct standard of review is "at the mild end of the heightened arbitrary and capricious scale." *Lasser v. Reliance Standard Life Insurance Co.*, 344 F.3d 381, 385 (3d Cir. 2003), *cert. denied*, 541 U.S. 1063 (2004).

problems effective July 21, 2004. A JADCO general manager, later clarified that Graham was placed on leave of absence on July 22, 2004.

Dr. Goldstein contends that Graham became totally disabled due to the condition of his left arm on July 21, 2004, or July 22, 2004. Giving Plaintiff the benefit of the doubt in this instance, the Court finds that if he was in fact totally disabled on July 21, 2004, Graham was covered, and eligible for benefits, under the Plan.

        C.        <u>Graham's Disability Under the Plan</u>

Where, as here, the Plan clearly places the burden on the claimant to submit medical evidence to support eligibility for benefits, Plaintiff must prove he was entitled to, but denied, disability benefits. *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d at 46. Moreover, to determine whether Plaintiff has carried his burden, this Court must look to the record as a whole. *Mitchell v. Eastman Kodak Co.*, 113 F.3d at 440. It is fundamental that in reviewing Guardian's decision to deny Graham disability benefits, this Court is limited to reviewing only that evidence that was before the administrator at the time the decision was made. *See Courson v. Bert Bell NFL Player Retirement Plan, 214 F.3d 136, 142 (3d Cir. 2000); Pinto v. Reliance Std. Life Ins. Co., 214 F.3d at 377*.

In order to receive STD benefits under the Plan, an employee must meet all of the following conditions:

> the employee must: (a) become disabled while insured by this plan; and (b) stay both disabled and insured by this plan continuously throughout the elimination period.
>
> the employee must be: (a) under a doctor's regular care for the cause of his or her disability; and (b) stay both disabled and receiving appropriate medical care for the cause of his or her disability and for any other sickness or injury which exists before, or occurs during, the period the employee is disabled under the plan.
>
> the employee must send [Guardian] acceptable written proof of: (a) his or her disability; and (b) his or her prior weekly earnings.

Disability, under the short term plan, means an employee "is completely unable to perform the

major duties of his or her regular occupation on a full-time basis due to sickness or injury . . ." An employee is not considered disabled under the Plan "if he or she is not under the regular care and treatment of a doctor."

In order to receive LTD benefits under the Plan, an employee must meet all of the following conditions:

> the employee must: (a) become totally disabled while insured by this plan; and (b) stay both totally disabled and insured by this plan continuously throughout the elimination period.
>
> the employee must be: (a) under a doctor's regular care for the cause of his or her disability; and (b) stay both disabled and receiving appropriate medical care for the cause of his or her disability and for any other sickness or injury which exists before, or occurs during, the period the employee is disabled under the plan.
>
> the employee must send [Guardian] acceptable written proof of: (a) his or her disability; (b) his or her prior monthly earnings; and (c) any current monthly earnings.

For the first twenty-four (24) months of an employee's disability under the long term disability plan, "total disability" means an employee "is completely unable to perform the major duties of his or her regular occupation on a full-time basis due to sickness or injury . . ." After an employee has been disabled for twenty-four (24) consecutive months, the definition changes, and "total disability" means " . . . due to sickness or injury, [an employee] is completely unable to perform the major duties of any occupation or work for which he or she is, or could become, qualified for by training, education or experience . . ."

Guardian denied Graham STD and LTD benefits under the Plan concluding that there was insufficient medical evidence he was totally disabled during the relevant time period, and there was no proof he was under the regular care and treatment of a doctor. After a comprehensive review of the record, and for the reasons set forth below, the Court finds that Guardian's decision to denial STD and LTD benefits was not arbitrary and capricious under the heightened standard of review. Though the Court disagrees with Guardian's contention that Graham was not under the care and treatment of a doctor at the time of his alleged disability, the Court finds insufficient

evidence in the record to support a finding of disability, either short term or long term, as defined in the Plan.

Dr. Goldstein was Graham's primary physician for the brachial plexopathy in his left arm since 1988. Graham's last regular appointment with Dr. Goldstein, prior to the onset of his total disability on July 21, 2004, occurred on February 11, 2004[3]. According to Dr. Goldstein's office notes from appointment, Graham was "managing his pain adequately and working." Graham's next contact with Dr. Goldstein occurred on May 10, 2004, when he called Goldstein's office to request a refill for his prescription for Vicodin[4]. There is no evidence that Graham requested an appointment with Dr. Goldstein between February 11, 2004, and July 21, 2004.

On June 22, 2004, and July 12, 2004, Graham was seen by Dr. Kathryn Ryan and Dr. Sheila Balestrino. The notes from Drs. Ryan and Balestrino indicate that they treated Graham for anxiety and stress at work. The treatment was not related to Graham's alleged disabling chronic pain, and the doctors made no opinion regarding disability.

The evidence of record, therefore, clearly indicates that Dr. Goldstein had been treating Graham for his left arm condition from its onset in 1988 until the alleged onset of his disability. The Court, therefore, finds that Graham has met the condition that he be under the regular care of a physician for the cause of his disability. Graham fails, however, to establish his disability.

Graham had worked full-time for JADCO for eight (8) years prior to the alleged onset of disability on or about July 21, 2004, with no evidence of having any medical restrictions placed on his work activities or having filed a prior disability claim. Further, there is no evidence that Graham saw Dr. Goldstein, Dr. Ryan, Dr. Balestrino, or any other medical provider for his left

---

[3]   Prior to the February 2004 appointment, Graham saw Dr. Goldstein for his left arm condition on January 17, 2002.

[4]   Graham had been taking Vicodin since 1992 for the pain in his arm, and he routinely called the office for refills. The record indicates that Graham also called Dr. Goldstein for Vicodin refills on the following dates: April 3, 2000; August 2, 2000; December 12, 2000; April 23, 2001; September 10, 2001; January 7, 2002; May 6, 2002; August 27, 2002; January 6, 2003; April 28, 2003; August 29, 2003; and January 12, 2004.

arm condition on any of the twenty-eight (28) dates he was absent from, or late for, work during the eighteen (18) months prior to alleged onset of disability.

In a letter to Guardian dated December 22, 2004, Dr. Goldstein stated that Graham's 1988 automobile accident "caused a severe brachial plexopathy leaving his left upper extremity completely paralyzed and non-functional." The doctor further stated that Graham " developed chronic pain associated with nerve damage" which Dr. Goldstein indicated Graham "managed quite well." Subsequent to Graham's February 2004 appointment with Dr. Goldstein, the doctor noted that Graham's "pain began increasing . . .[and] [b]y July 21, 2004 his pain level had increased to the point where he could not function at work." Further, the Dr. Goldstein stated: "[h]e contacted my office on July 28, 2004 due to his severe pain."

Though Dr. Goldstein opines that Graham's pain began increasing to the point Graham was unable to function at work, there is absolutely no evidence in the record that Graham notified his office of such condition between February 11, 2004, and July 28, 2004. Nor is there any evidence that Graham approached anyone at JADCO indicating a change in his condition or any required work modifications. The first medical intervention after July 21, 2004, was an emergency room visit by Graham at Butler Memorial Hospital on July 24, 2004. The notes from the emergency room visit certainly do not substantiate disability. Graham received no treatment to his left arm at that time and no diagnostic tests were performed on his left arm. Because the emergency room notes indicated a misuse of prescription drugs as well as a use of "street drugs," the only test ordered at that time was a drug screen. The test was positive for "cocaine metabolites by immunoassay" and "acetaminophen." The final diagnosis from Butler Memorial Hospital was "mixed drugs substance abuse."

After speaking with Graham on July 28, Dr. Goldstein referred him to the UPMC Pain Program where he was treated by Cheryl Bernstein, M.D. Dr. Bernstein evaluated Graham on August 13, 2004. In her report, Dr. Bernstein noted:

> [Graham] stated that about 1 month ago, he had been having more
> stress at work, . . . so he went to a physician to talk about his stress

> at work with whether restructuring his job or things like that [sic]. The doctor diagnosed him with stress and anxiety disorder and prescribed [] Klonopin. He took 1 or 2 tablets and overslept from work for 2 days. After that his company dismissed him temporarily for absence and sent him to Butler Hospital for detoxification for drug abuse.

Graham did not indicate to Bernstein that the pain in his left arm caused him to miss work. To the contrary, Graham told Dr. Bernstein that the pain in his left upper extremity was "bearable." He further stated that the "pain is made worse with stress and made better with Vicodin, associated with numbness." Such statements by Graham directly contradict Dr. Goldstein's letter of December 22, 2004, in which the doctor indicated Graham's pain was so severe "he could not function at work." While denying drug abuse, Graham admitted that he was accused of abusing alcohol by JADCO officials.

After evaluation of Graham on August 13, 2004, Dr. Bernstein's assessment stated that Graham "does have some apparent behaviors of his drug use and alcohol, and that is why he got in trouble at work." Dr. Bernstein further indicated she "planned to work with [Graham] at the pain rehabilitation program," and she recommended Graham stop taking Vicodin because the little amount he was taking " combined with his alcohol use has jeopardized his work and his employment." Moreover, even though Graham presented UPMC with an application for short term disability application, neither Dr. Bernstein nor anyone else at UPMC certified that Graham was disabled due to pain in his left arm or for any other reason.

Dr. Goldstein then saw Graham on August 25, 2004. Graham told the doctor that he was experiencing episodes of exacerbation of upper left extremity pain that was so severe on some days he could not attend work. Graham also reported that he was depressed, his stress level at work was increasing due to restructuring, and that such stress increased his pain.

Dr. Goldstein's statements in the notes from Graham's August 25th appointment, in Graham's August 31, 2004, disability application, and in his December 22, 2004, letter to Guardian, comprise the only medical evidence submitted by Graham directed to total disability as defined in the Plan.

Guardian was not obliged to accord special deference to Dr. Goldstein's opinion as the treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). In *Black & Decker*, the Supreme Court stated, "plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834. Because there is no evidence in the record supporting Dr. Goldstein's contention that Graham's pain became so severe in July of 2004 that he could not function at work, the Court has a difficult time giving such opinion even a modicum of weight in this instance.

In addition, Guardian had Graham's medical file reviewed by Walter W. Strauser, M.D., a physician board certified in psychiatry, and in physical medicine and rehabilitation. In a report dated May 30, 2006, Dr. Strauser concluded that the medical records failed to support Dr. Goldstein's contention that Graham was totally disabled due to left arm pain. Dr. Strauser found no explanation regarding how "Graham could experience a significant change in neurological condition " sixteen (16) years after the accident caused his condition and eight (8) years after he returned to work given the static nature of Graham's "upper limb musculoskeletal and neurological impairments." Graham submitted additional medical information, and after review, Dr. Strauser submitted a supplemental report indicating that any increase in pain "was more likely than not related to his reduced ability to cope with his pain due to his mental challenges and not due to any change in his underlying physical condition." Further, Dr. Strauser failed to find "evidence [of] . . .a significant change in the long-standing neurological impairment related to [Graham's] left brachial plexopathy." Therefore, Dr. Strauser found that, from a physical standpoint, Graham was "capable of continuing to work at his usual and customary job."

Clearly, Guardian and its reviewing physicians considered Graham's medical records and

reports and concluded, contrary to his physician's contention, that he was able to work in a capacity that removed him from the definition of disabled under the Plan. In addition to insufficient medical evidence of disability, JADCO does not support the onset of disability on or about July 21, 2004. There is no evidence Graham notified JADCO of any claim of disability prior to his leave of absence. Moreover, JADCO contends the leave of absence was was entirely due to poor performance and absentee issues.

Graham also infers that weight should be given to a 2004 Social Security Administration ("SSA") determination of disability. The decision of the SSA may be considered as a factor in evaluating whether a plan administrator has acted arbitrarily and capriciously in reviewing a plaintiff's claim. *See Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 Fed. Appx. 266, 269 (3d Cir. 2006)(citing *Dorsey v. Provident Life & Accident Ins. Co.*, 167 F. Supp. 2d 846, 856 n.11 (E.D. Pa. 2001)). However, a Social Security award does not in itself indicate that an administrator's decision was arbitrary and capricious, and a plan administrator is not bound by the SSA decision. *See Marciniak v. Prudential Fin. Ins. Co. of Am.*, *supra*.; *see also Russell v. Paul Revere Life Ins. Co.*, 148 F. Supp. 2d 392, 409 (D. Del. 2001) ("[A] plan administrator's decision on ERISA disability that differs from that of the SSA is not arbitrary and capricious provided it is reasonable and supported by substantial evidence.") Here, Guardian's determination was reasonably grounded on substantial evidence.

The Court, therefore, finds substantial evidence in the record to support the decision to deny Graham disability benefits, both short term and long term, under the Plan.

### V.   CONCLUSION

Based upon the foregoing, Guardian's motion for summary judgment will be granted, and Graham's motion for summary judgment will be denied.. An appropriate order will follow.

s/ David Stewart Cercone  
David Stewart Cercone  
United States District Judge

cc: Gregory G. Paul, Esquire
Robert W. Gillikin, II, Esquire
Peirce Law Offices
707 Grant Street
2500 Gulf Tower
Pittsburgh, PA 15219

Michael D. Epstein, Esquire
Montgomery McCracken Walker
 and Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109